**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raymond SHRYOCK, a/k/a Huero**
**Shy, Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Jesse Moreno, Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Ruben Hernandez, a/k/a Tupi,**
**Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Alex Aguirre, aka, Pee Wee, aka**
**Howard, Defendant–**
**Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Juan Arias, Defendant–Appellant.**

United States of America,
Plaintiff–Appellee,

v.

Randy Therrien, a/k/a Cowboy,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Ruben Castro, aka Nite Owl,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Daniel Barela, Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

David Gallardo, Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Raymond Mendez, aka Champ,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Joe Hernandez, aka Shakey Joe,
Defendant–Appellant.

Nos. 97–50468, 97–50470, 97–50473, 97–50475, 97–50476, 97–50479, 97–50480, 97–50482, 97–50483, 97–50486, 97–50487.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 2, 2003.

Filed Sept. 4, 2003.

958

Jay L. Lichtman, Law Offices of Jay L. Lichtman, Los Angeles, California, for defendant-appellant Raymond Shryock.

Phillip A. Trevino, Los Angeles, California, for defendant-appellant Jesse Moreno.

Joseph Francis Walsh, Los Angeles, California, for defendant-appellant David Gallardo.

Karen L. Landau, Oakland, California, for defendant-appellant Joe Hernandez.

Maria E. Stratton, Federal Public Defender, Los Angeles, California, for defendant-appellant Alex Aguirre.

Sonia E. Chahin, La Canada, California, Darlene M. Ricker, Malibu, California, for defendant-appellant Ruben Hernandez.

Michael J. Treman, Santa Barbara, California, for defendant-appellant Juan Arias.

Morton H. Boren, Los Angeles, California, for defendant-appellant Randy Therrien.

Robert Ramsey, Jr., Ramsey & Price, Los Angeles, California, for defendant-appellant Ruben Castro.

Gail Ivens, Glendale, California, for defendant-appellant Raymond Mendez.

Elana Shavit Artson, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Patrick J. Fitzgerald, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Andrea L. Russi, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before THOMPSON, TROTT, and TALLMAN, Circuit Judges.

TROTT, Circuit Judge.

In these consolidated appeals, Defendants Appellants Alex Aguirre ("Aguirre"), Juan Arias ("Arias"), Daniel Barela ("Barela"), Ruben Castro ("R. Castro"), David Gallardo ("Gallardo"), Joe Hernandez ("J.Hernandez"), Ruben Hernandez ("R. Hernandez"), Raymond Mendez ("Mendez"), Jesse Moreno ("Moreno"), Raymond Shryock ("Shryock"), and Randy Therrien ("Therrien"), (collectively "Appellants"), appeal from their convictions and sentences following an eight-month jury trial. Appellants were charged with various offenses arising from their involvement with the Mexican Mafia, also know as La Eme.

The jury convicted each Appellant of a substantive violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962(c), conspiracy to violate RICO under 18 U.S.C. § 1962(d), and—except Moreno—conspiracy to aid and abet narcotics trafficking in violation of 21 U.S.C. § 846.

The jury also convicted individual Appellants of other crimes. For murder to maintain or increase their position in a RICO enterprise, in violation of 18 U.S.C. § 1959(a)(1) and (2), the jury convicted Aguirre of one count, Gallardo of three counts, Shryock of one count, and Therrien of two counts. For assault with a deadly weapon to maintain or increase their position in a RICO enterprise, in violation of 18 U.S.C. § 1959(a)(2) and (3), the jury convicted Aguirre of one count, Arias of one count, Gallardo of two counts, J. Hernandez of one count, and Shryock of two counts. For conspiracy to commit murder to maintain or increase their position in a RICO enterprise, in violation of 18 U.S.C.

§ 1959(a)(5), the jury convicted Aguirre of one count, Barela of four counts, R. Castro of five counts, Gallardo of two counts, J. Hernandez of two counts, Mendez of one count, Moreno of two counts, Shryock of four counts, and Therrien of two counts. For knowingly carrying and using a firearm during and in relation to the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1), the jury convicted Aguirre of one count, Arias of one count, Barela of two counts, and Gallardo of two counts. For knowingly or intentionally possessing with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), the jury convicted Aguirre of one count, Barela of two counts, and Therrien of one count. The jury convicted J. Hernandez of one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and found money or property of his subject to forfeiture pursuant to 18 U.S.C. § 924(d)(1) as a result.

The indictment also sought forfeitures in connection with the RICO charges, under 18 U.S.C. § 1963, and in connection with the conspiracy to aid and abet narcotics trafficking charge, under 21 U.S.C. § 853. The district court dismissed these counts except as to Aguirre, Mendez, and Therrien. After the district court held a bifurcated trial on these counts, the jury returned forfeiture verdicts against the property of all charged Appellants.

The district court imposed the following sentences: (1) 384 months for Arias and J. Hernandez; (2) life imprisonment for Barela, R. Castro, R. Hernandez, Mendez, Moreno, Shryock, and Therrien; (3) life plus sixty months for Aguirre; and (4) life plus 300 months for Gallardo.

On appeal, Appellants raise numerous challenges to their convictions and sentences. Appellants principally contend that the district court (1) erred by empaneling an anonymous jury and limiting the scope of a hearing on juror misconduct; (2) violated their constitutional right to a public trial; (3) erred by denying their motions to suppress wiretap and videotape evidence; (4) erred in several trial rulings; (5) erred in discovery rulings; (6) erred in several jury instructions; and (7) erred in the sentences imposed. We have jurisdiction pursuant to 28 U.S.C. § 1291. Ultimately, we affirm Appellants' convictions and sentences, except that we vacate R. Hernandez's sentence and remand for resentencing of R. Hernandez only.

## BACKGROUND

We provide only a general factual background at this preliminary juncture. Additional facts necessary to the discussion of the several issues are contained in the portions of this opinion in which those issues are addressed. The factual recitals are based on trial testimony and other evidence that the jury could reasonably have credited in reaching its verdicts.

Appellants were named in a thirty-one-count superseding indictment charging them and ten others.[1] The charges stemmed from Appellants' involvement with the Mexican Mafia. At trial, the government presented voluminous evidence, including: (1) approximately 275 audiotapes of conversations between the defendants and their coconspirators, including wiretaps on the phones of J. Hernandez, consensual recordings of telephone conversations and face-to-face meetings, and re-

---

1. Richard Gutierrez, Ralph Rocha, Michael Salinas, Sammy Villalba, George Bustamonte, Joe Herrera, and David Perez pled guilty before trial. Benjamin Peters and Victor Murillo were tried together with Appellants. The jury convicted Peters and acquitted Murillo. Peters died pending trial. Ambrose Gill's case was severed and he pled guilty following Appellants' trial.

cordings made at the Los Angeles County Jail and Pelican Bay State Prison in California; (2) approximately 125 witnesses, including law enforcement officers, forensic experts, former Mexican Mafia members Ernesto Castro ("E. Castro") and Johnny Torres ("Torres"), and former Mexican Mafia associate James Prado ("Prado"); and (3) fourteen videotapes of meetings between Mexican Mafia members.

## A. The Mexican Mafia's Structure and Operation

Los Angeles County Sheriff's Deputy Richard Valdemar ("Deputy Valdemar"), an expert witness, testified that the Mexican Mafia is a prison gang formed in the 1950s by Hispanic street gang members incarcerated at the Deuel Vocational Institution, located in Tracy, California. The founding members formed the organization to protect Hispanics from other such gangs within California's jails and prisons. By using violence, the Mexican Mafia eventually gained significant power and control over illegal activities in the California prison system. As members were released from state custody, they extended their influence outside the prison system to control drug distribution—principally by "taxing" drug dealers—in parts of Southern California.

At the time of trial, Deputy Valdemar testified that the Mexican Mafia had 250 to 300 members. In addition, the gang had numerous associates who aspired to become members and were willing to commit crimes on the Mexican Mafia's behalf in hopes of attaining membership. Deputy Valdemar identified J. Hernandez as an associate, and the other Appellants as members of the Mexican Mafia.

E. Castro testified that defendant Benjamin Peters ("Peters") prepared him for membership in the Mexican Mafia while both were incarcerated at the California Institution for Men, located in Chino, California ("Chino State Prison"). He recounted Peters's explanation to him of the route to membership: "If the mafia has any enemies, that they're also my enemies, so long as I take care of them by stabbing them, then that would deem me eventually a member." The Mexican Mafia required a vote of three members to make a new member or murder an existing member, but did not require a vote for a member to kill a nonmember.

E. Castro and Torres testified for the prosecution that Mexican Mafia members had to follow four rules: a Mexican Mafia member cannot (1) be an informant; (2) be a homosexual; (3) be a coward; or (4) disrespect or politick against another member. Death was the automatic consequence for violation of any of the first three rules, and only a member could carry out the murder of another. While in prison, the Mexican Mafia expected its members to engage in drug trafficking, extortion, and any other activity to acquire money and exert power and control over other inmates. Outside prison, Mexican Mafia members met regularly to discuss and vote on actions in furtherance of the members' illegal activities.

According to E. Castro, Mexican Mafia members communicated in prison by having meetings in the exercise yard, sending messages through visitors or inmates who were transferred between prisons, and passing small notes known as "kites" or "wilas." E. Castro further testified that Mexican Mafia members operated under a "code of silence," which obligated them to deny any membership in or knowledge of the organization. Because of this code, E. Castro stated that he testified in a previous case involving R. Hernandez and falsely denied the existence of the Mexican

Mafia and R. Hernandez's membership in it.

## B. Specific Crimes

Summarized below from the evidence are some relevant events in chronological order underlying the charges in the indictment.

### 1. Conspiracy and Attempted Murder of Salvador Buenrostro

On July 16, 1991, Peters and Mexican Mafia member Rene "Boxer" Enriquez attacked with premeditation and deliberation Salvador "Mon" Buenrostro, another Mexican Mafia member, in the attorney visiting room at the Los Angeles County Jail. Although stabbed twenty-six times, Buenrostro survived the attack.

E. Castro testified that he was incarcerated in the Los Angeles County Jail at the time of the attack, and that Peters told him Buenrostro was on the Mexican Mafia's hit list because Buenrostro had politicked against deceased member Joe Morgan. To prearrange for the attack, Prado, a Mexican Mafia associate, manipulated the justice system by causing Buenrostro to be subpoenaed to the Los Angles County Jail from another institution, allegedly to testify in Prado's upcoming trial, and placed a "hold" on Peters to prevent Peters from being transferred to another jail. At Peters's request, Prado made a shank (prison knife) and gave it to Peters to use in the attack. Likewise, E. Castro made a knife and provided it to Enriquez. Enriquez then arranged for jail authorities to call himself, Peters, and Buenrostro to the attorney visiting room simultaneously. Once there, Peters and Enriquez attacked Buenrostro while Enriquez shouted "kill him."

The indictment charged the conspiracy and attempted murder of Buenrostro as a racketeering act underlying the substantive RICO charge, and the jury found the crimes proven as to Peters.

### 2. Conspiracy and Murder of Charles Manriquez

On March 25, 1992, Gallardo shot and killed Mexican Mafia member Charles "Charlie Brown" Manriquez in the Ramona Gardens housing project ("Ramona Gardens"). Gallardo shot Manriquez six times. The police recovered several .380 caliber semi-automatic shell casings at the scene and three .380 caliber bullets from Manriquez's body.

E. Castro testified that in 1991 while at Chino State Prison, E. Castro, Manriquez, and other Mexican Mafia members agreed to stab two individuals named "Colorado" and "Smiley." E. Castro stabbed "Colorado," but Manriquez failed to stab "Smiley" despite two opportunities to do so. When Peters later transferred to Chino State Prison, E. Castro informed him of Manriquez's cowardice. Peters told E. Castro to do whatever he felt was right, which E. Castro interpreted as meaning he could kill Manriquez.

About a week after his release from custody, E. Castro met separately with Gallardo and Therrien, who agreed that they should kill Manriquez (now also out of custody) for his cowardice. Gallardo agreed to do the killing. E. Castro obtained a handgun from Therrien and gave it to Gallardo. One week later, Gallardo told E. Castro that he shot Manriquez in the face and when Manriquez turned and ran, he shot him in the back.

The indictment charged the conspiracy and murder of Manriquez as a racketeering act, and the jury found the crimes proven as to Gallardo, Peters, and Therrien. The jury also convicted (1) Gallardo and Therrien of Manriquez's murder to maintain or increase their positions in a

RICO enterprise; and (2) Gallardo of knowingly carrying and using a firearm during and in relation to the murder.

### 3. *Murder of Ana Lizarraga*

E. Castro testified that in 1990 he attended a meeting during which Gallardo indicated his desire to kill Ana Lizarraga because she was a police informant and was interfering with his drug trafficking in Ramona Gardens. Lizarraga was a youth gang worker and had acted in Edward James Olmos's movie "American Me," a fictionalized account of a California Hispanic prison gang based on the Mexican Mafia that some members of the real Mexican Mafia believed negatively portrayed their organization.

On May 13, 1992, Jose "Joker" Gonzales, a Hazard gang member,[2] and an unidentified gunman shot Lizarraga thirteen times, killing her. Los Angeles Police Department ("LAPD") Officer Thomas Lira was nearby at the time of the shooting and heard several gunshots. He drove toward the gunshots and observed two masked men fire at Lizarraga while she stood in her driveway with her son. As Lizarraga fell to the ground, the gunmen walked closer to her and continued to shoot. When the shooting ceased, the suspects turned and ran toward Officer Lira's patrol car. One suspect pointed his gun at Officer Lira, who ducked and accelerated his vehicle to avoid being shot. Police arrested Gonzales minutes after the shooting, and a California court subsequently convicted him of first-degree murder.

At a January 1995 meeting, Gallardo told E.Castro that he wanted to sponsor Gonzales to become a Mexican Mafia member because Gonzales had killed Lizarraga. In addition, during an audiotaped visit at Pelican Bay State Prison on December 31, 1994, Peters told his mother, Paz Gutierrez, that "[Gonzales was] .... the one that killed that lady in the projects. The one that made the movies with, with Olmos."

The indictment charged Lizarraga's murder as a racketeering act, and the jury found the crime proven as to Gallardo.

### 4. *Conspiracy and Murder of Manuel Luna*

On August 7, 1993, Aguirre shot and killed Mexican Mafia member Manuel "Rocky" Luna. The police found Luna's body riddled with gunshot wounds in the driver's seat of a car parked in Ramona Gardens.

E. Castro testified that an informant named "Mad Dog" Roselli had been placed on the Mexican Mafia hit list. On July 4, 1993, E. Castro, Gallardo, Aguirre, and another Mexican Mafia member saw Roselli at a park. E. Castro wanted to kill Roselli, but Gallardo interceded and told him that Luna had the assignment to kill him. Subsequently, E. Castro saw Luna with Roselli twice but Luna failed to kill Roselli. E. Castro raised Luna's failure to carry out his assignment during a meeting with Gallardo, Therrien, and other Mexican Mafia members. After the members present raised other complaints about Luna, they voted to kill him.

The following day, Gallardo told E. Castro that Luna was dead. E. Castro testified that Aguirre told him he killed Luna, and that Gallardo, Therrien, and another Mexican Mafia member were present. Aguirre explained that initially they wanted to stab Luna, but Gallardo objected that stabbing would create too much noise and blood. Instead, Gallardo furnished a gun, which Aguirre used to shoot Luna. E. Castro also testified that when he saw Gallardo at Arias's house a week after

---

**2.** Hazard was the only street gang operating in Ramona Gardens.

Aguirre killed Luna, Gallardo admitted he had hid the barrel of the gun used in the murder at the house.

A September 3, 1994 audiotaped visit at Pelican Bay State Prison between Peters and Paz Gutierrez corroborated E. Castro's testimony. During a conversation regarding Gallardo's problems in Ramona Gardens, Gutierrez told Peters that "Hazard was in, was in a lot of trouble." Peters responded, "It's behind Rocky [Luna], when they killed Rocky. And then they killed Rascal [Ricardo Gonzales] and they, they, and they thought Smilon (Gallardo) did it."

The indictment charged the conspiracy and murder of Luna as a racketeering act, and the jury found the crimes proven as to Aguirre, Gallardo, and Therrien. The jury also convicted (1) Aguirre, Gallardo, and Therrien of Luna's murder to maintain or increase their positions in a RICO enterprise; and (2) Aguirre of knowingly carrying and using a firearm during and in relation to the murder.

### 5. Conspiracy to Murder Michael Perry

E. Castro testified that R. Hernandez told him he felt disrespected by Michael "Flaco" Perry, a Mexican Mafia member. R. Hernandez told E. Castro that he arranged for Perry to stay with a friend named Charlene. While there, Perry engaged in inappropriate sexual behavior in front of Charlene's children. Shortly before E. Castro was released from prison in 1990 or 1991, R. Hernandez asked him to kill Perry.

During a meeting in 1993, attended by Aguirre, Therrien, and other Mexican Mafia members, E. Castro relayed what R. Hernandez had told him. All present agreed Perry should be killed. They planned another meeting to which they would lure and kill Perry, but he failed to appear. Later, the group met at the home of Mexican Mafia member Raul "Dagwood" Vasquez ("Vasquez") and reaffirmed the decision to kill Perry. During that meeting, Vasquez telephoned another Mexican Mafia member, Frank Buelna, and told him that Perry had to be killed.

The indictment charged the conspiracy to murder Perry as a racketeering act, and the jury found the crime proven as to Gallardo and Therrien.

### 6. Murder of Ricardo Gonzales

On December 5, 1993, police found the body of Ricardo "Rascal" Gonzales in Ramona Gardens. He died of multiple stab wounds and blunt force trauma to the head. Ricardo Gonzales was a Hazard gang member and brother of Mexican Mafia member Jose "Joker" Gonzales (who killed Ana Lizarraga for Gallardo).

On December 7, 1993, E. Castro recorded a conversation at Vasquez's home, during which Gallardo and Vasquez told E. Castro that Gonzales was stabbed during a shootout with Hazard gang members. Gallardo explained he went to Ramona Gardens to "make[ ] a point" because Hazard gang members were interfering with his drug trafficking operations in the area. Notably, Gallardo singled out "Capone" (Humberto Madrigal) and "Conrad" (Conrad Morales) as "instigating everything." Gallardo confronted and fired shots at some Hazard gang members, who returned fire. Gallardo stated, "[Gonzales] was right there Joker's brother ... I don't think I shot [Gonzales] ... you know it was Joker's brother, he didn't have that coming, it's just everything came at us, Boom!" Gallardo also told E. Castro that he wanted him to know the circumstances of Gonzales's death because "whatever happens, man, you know Joker's probably just gonna trip, what the fuck happen, you

know, but it was just something that just unfolded right there man, it's fucked up, but I mean he brought that on himself, ay. You know."

Later in the recorded conversation, Vasquez picked up a switch-blade knife, made downward stabbing motions, and stated "This is the one I killed his homeboy with." E. Castro testified that "his homeboy" referred to Ricardo Gonzales.

The indictment charged the murder of Ricardo Gonzales as a racketeering act, and the jury found the crime proven as to Gallardo. The jury also convicted Gallardo of Gonzales's murder to maintain or increase his position in a RICO enterprise.

### 7. *Conspiracy and Attempted Murder of Humberto Madrigal*

As noted above, during a recorded conversation on December 7, 1993, Gallardo told E. Castro that Humberto "Capone" Madrigal instigated problems for Gallardo in Ramona Gardens. On January 13, 1994, Madrigal was walking home when Gallardo shot him fourteen times from the passenger side of a moving vehicle. Madrigal survived.

E. Castro testified that in two separate conversations, Gallardo and Mexican Mafia member Antonio "Tonito" Rodriguez ("Rodriguez") told him that they went to Ramona Gardens looking for Madrigal, and that Gallardo shot Madrigal several times. Rodriguez related to E. Castro that they had been in a car, and that Gallardo reached across the passenger's window and started shooting at Madrigal.

LAPD Detective Lawrence Martinez testified that he interviewed Madrigal at the hospital three days after he was shot, and Madrigal identified Gallardo as the shooter. In December 1994, Detective Martinez re-interviewed Madrigal at Madrigal's home and showed him a photographic lineup. Madrigal again identified Gallardo as the shooter.

Because of Madrigal's identification, the government initiated parole revocation proceedings against Gallardo. At both the revocation hearing and the trial here, however, Madrigal testified that he did not know who shot him. Substantial evidence at trial proved that Madrigal refused to identify Gallardo after receiving threats from Aguirre and other Mexican Mafia members. For instance, in a recorded call on January 6, 1995, Gallardo telephoned J. Hernandez and informed him, "[Madrigal] ... he's no longer scared to testify against me" in the parole revocation proceeding. An hour later, J. Hernandez called Rodriguez to communicate a message that Gallardo wanted to talk to him about Madrigal's testimony and related the substance of his and Gallardo's earlier conversation. Rodriguez instructed J. Hernandez to get Aguirre on the telephone. J. Hernandez did so, and during a three-way call Rodriguez informed Aguirre of Gallardo's situation. In another recorded call on January 10, 1995, Aguirre reported to Rodriguez that he had spoken to Madrigal and persuaded him not to testify. Rodriguez emphasized that "this is an important thing," and Aguirre responded that he "took care of that already." During a videotaped meeting on January 28, 1995, E. Castro asked about Madrigal and Aguirre responded, "I talked to him on the phone.... I told him ... rumor has it, that you know, that you said somethin' about you know, [Gallardo] this and that and the dude said hey, man, I ain't said nothin' about him ... I'll go [to] court and help him out."

The indictment charged the conspiracy and attempted murder of Madrigal as a racketeering act, and the jury found the crimes proven as to Gallardo. The jury also convicted Gallardo of (1) assaulting

Madrigal with a deadly weapon to maintain or increase his position in a RICO enterprise; and (2) knowingly carrying and using a firearm during and in relation to the assault.

### 8. Conspiracy and Attempted Murder of Eduardo Soriano

On February 22, 1994, LAPD officers responded to a report of shots fired at the Ramona Gardens home of Ricardo and Eduardo Soriano. Paramedics found Arias on a curb suffering from four gunshot wounds, and transported him to the hospital. Paramedics also transported Eduardo Soriano to the hospital with a gunshot wound to the hand. Officers found nine 9 millimeter casings in front of the house and several bullet holes in the wall below Ricardo and Eduardo's bedroom window. There were also several bullet marks in the pavement where shots fired from inside the house had struck the ground. Arias's van was parked in a nearby lot and the police recovered the van's keys next to some trash cans. Inside the van, officers found a box of 9 millimeter ammunition that was missing nine rounds (the exact number of casings found in front of the house). Near the house, officers recovered a 9 millimeter handgun and a .38 caliber revolver with six empty casings in the cylinder.

On the following day, Rodriguez told E. Castro in a recorded conversation that Gallardo and Arias had gone to Ramona Gardens looking for the Soriano brothers, and that Arias had been shot in the resulting exchange of gunfire. Arias subsequently pled guilty to shooting at an inhabited dwelling in violation of California state law.

The indictment charged the conspiracy and attempted murder of Soriano as a racketeering act, and the jury found the crimes proven as to Arias and Gallardo. The jury also convicted (1) Arias and Gallardo of assaulting Soriano with a deadly weapon to maintain or increase their positions in a RICO enterprise; and (2) Arias of knowingly carrying and using a firearm during and in relation to the assault.

### 9. Murder of Albert Orosco, and Attempted Murders of Hector Galvez and Freddie Garcia

Albert Orosco, Hector Galvez, and Freddie Garcia were members of the Chino Sinners street gang. On March 13, 1994, an unidentified assailant shot Garcia in the leg. On March 14, 1994, Larry Hernandez shot Galvez and Orosco multiple times. Galvez survived, but Orosco died.

During a recorded conversation on March 21, 1994, Shryock told E. Castro, "I sent them dudes to kill [Orosco] ... and [Galvez] ... they got off, and Freddie [Garcia] got shot in the leg.... [S]ome dude named Larry did it." Shryock further stated that because Galvez, Garcia, and Orosco were "puttin' [guns] on little kids heads and hitting old women ... to take their money," he spoke to the alleged victims, and

> told 'em look, man, don't give 'em no fuckin' money no more, I said ... and the next time you see 'em, if you want to, go ahead and kill them.... [S]o that's what they did. The[ ] next time he came to collect from somebody he blew him away. They, they killed [Orosco] and, and [Galvez].... And so [Garcia] is the only one that's loose.[3]

Shryock made similar statements at the videotaped March 27, 1994 meeting. This version of the events was supported by E. Castro's discussion of the incident with Paz Gutierrez, who told him that a guy

---

**3.** Galvez spent two months in the hospital, but did not die.

named Larry killed Orosco and shot Galvez because Larry was tired of being taxed.

The indictment charged the conspiracy and murder of Orosco, conspiracy and attempted murder of Galvez, and conspiracy and attempted murder of Garcia as racketeering acts. The jury found the crimes proven as to Shryock, and also convicted Shryock of (1) Orosco's murder to maintain or increase his position in a RICO enterprise; (2) assault on Galvez to maintain or increase his position in a RICO enterprise; and (3) assault on Garcia to maintain or increase his position in a RICO enterprise.

### 10. *Conspiracy to Murder Jesse Aragon*

At the videotaped March 27, 1994 meeting, Shryock, Barela and other Mexican Mafia members discussed killing Mexican Mafia member Jesse "Sleepy" Aragon. The members at the meeting decided to kill Aragon because he failed to carry out his assignment to kill a witness against another Mexican Mafia member, and he questioned the decision to kill Mexican Mafia member Phillip "Gibby" Escobar.[4] At the videotaped March 30, 1994 meeting, the members present assigned Escobar to kill Aragon, and Shryock offered to provide a weapon. On April 5, 1994, Escobar met with Art Aguilar, a Shryock associate, who provided Escobar with a gun. Law enforcement arrested Aragon, however, before he could be killed.

The indictment charged the conspiracy to murder Aragon as a racketeering act, and the jury found the crime proven as to Barela and Shryock. The jury also convicted Barela and Shryock of conspiracy to murder Aragon to maintain or increase their positions in a RICO enterprise.

### 11. *Conspiracy to Murder Francisco Martinez*

At the videotaped March 27 and 30, 1994 meetings, Barela, R. Castro, Moreno, Shryock, Therrien, and other Mexican Mafia members discussed killing Francisco "Puppet" Martinez, a Mexican Mafia member incarcerated at Pelican Bay State Prison. These conspirators decided to kill Martinez because he was politicking against other members, threatening to kill other members, claimed to have made an individual a member without following the proper procedure, and for generally causing dissension within the organization. Accordingly, the conspirators devised a plan to invite Martinez to a meeting as a pretext and kill him. Law enforcement, however, arrested Martinez before he could be killed.

The indictment charged the conspiracy to murder Martinez as a racketeering act, and the jury found the crime proven as to Barela, R. Castro, Moreno, Shryock, and Therrien. The jury also convicted the same Appellants of conspiracy to murder Martinez to maintain or increase their positions in a RICO enterprise.

### 12. *Conspiracy to Murder Danilo Garcia*

Between October and December 1994, government agents intercepted telephone calls in which R. Castro and J. Hernandez plotted to kill Danilo Garcia, an inmate at the Los Angeles County Jail. Law enforcement placed Garcia in protected custody, thwarting any attempts to kill him.

The indictment charged the conspiracy to murder Garcia as a racketeering act, and the jury found the crime proven as to

---

**4.** Although Mexican Mafia members voted to kill Escobar, an internal discussion resulted in the Mexican Mafia placing his killing on "hold."

R. Castro and J. Hernandez. The jury also convicted the same Appellants of conspiracy to murder Garcia to maintain or increase their positions in a RICO enterprise.

### 13. *Conspiracy to Murder Donald Ortiz*

At the videotaped September 25, 1994 meeting, Arias, Barela, Mendez, Therrien, and Shryock reaffirmed an earlier decision to kill Mexican Mafia member Donald "Little Man" Ortiz because Ortiz had "disrespected" the Mexican Mafia. This decision was also reaffirmed at the videotaped April 9, 1995 meeting, attended by Aguirre, R. Castro, Gallardo, Mendez, Shryock, and Therrien. By April 1995, however, the jail where Ortiz was incarcerated placed him in protective custody and no Mexican Mafia member had access to him. Accordingly, Gallardo proposed an exception to the rule that only a member could kill another, and to permit an associate to carry out the murder. The members present agreed and decided to have someone subpoena Ortiz to court as a pretext, so that an associate from the gang module where Ortiz was housed could kill him.

The indictment charged the conspiracy to murder Ortiz as a racketeering act, and the jury found the crime proven as to Aguirre, Barela, R. Castro, Gallardo, J. Hernandez, Mendez, Shryock, and Therrien. The jury also convicted the same Appellants of conspiracy to murder Ortiz to maintain or increase their positions in a RICO enterprise.

### 14. *Conspiracy to Murder Ramiro Valerio*

Ramiro "Greedy" Valerio was collecting money from drug dealers by claiming he was a member of the Mexican Mafia. At the videotaped March 27, 1994 meeting, the members present clarified that Valerio was not a member and therefore had no authority to collect money or act on the Mexican Mafia's behalf. Consequently, R. Castro and other Mexican Mafia members discussed plans to kill Valerio. Because Valerio wore thick glasses, the members dubbed their murder plot "Operation Coke Bottle."

On November 21, 1994, R. Castro called Rodriguez to advise him that the police had arrested Valerio and he was in jail, so R. Castro now had the opportunity to kill him. During subsequent conversations, R. Castro devised a plan to kill Valerio while in custody. Law enforcement, however, intercepted these calls and foiled "Operation Coke Bottle" by placing Valerio in protective custody.

The indictment charged the conspiracy to murder Valerio as a racketeering act, and the jury found the crime proven as to R. Castro. The jury also convicted R. Castro of conspiracy to murder Valerio to maintain or increase his position in a RICO enterprise.

### 15. *Conspiracy to Murder Conrad Morales*

Gallardo disliked Conrad Morales, a Hazard gang member, because he interfered with Gallardo's drug trafficking in Ramona Gardens. During a recorded conversation on November 28, 1993, Gallardo told E. Castro that Morales and his wife "should not get away with living another new years.... [B]ecause they are laughing at us every day." At a meeting on January 25, 1994, Raul Vasquez discussed the need to kill Morales, to which Gallardo replied "That's right." At the videotaped March 30, 1994 meeting, the participants again raised the issue of killing Morales. R. Castro offered to send "crews" to shoot any Hazard gang members that the Mexican Mafia decided to kill. Shryock then

identified Morales as a target, to which R. Castro responded: "He can be reduced to nothing real quick though .... he's targeted." At a subsequent videotaped meeting, on April 30, 1994, Barela, Moreno, and Shryock stated that Morales had to be killed to end the hostilities between the Mexican Mafia and the Hazard street gang.

The indictment charged the conspiracy to murder Morales as a racketeering act, and the jury found the crime proven as to Barela, R. Castro, Gallardo, Moreno, and Shryock. The jury also convicted the same Appellants with conspiracy to murder Morales to maintain or increase their positions in a RICO enterprise.

### 16. Conspiracy to Aid and Abet the Distribution of Narcotics

The Mexican Mafia's drug trafficking operations on the streets and in prison were a main topic of the wiretap and videotape evidence, and E. Castro's testimony. This evidence overwhelmingly showed an extensive conspiracy to aid and abet the distribution of narcotics.

#### a. Narcotic Distribution on the Streets

Appellants aided and abetted the distribution of narcotics on the streets. First, the record shows that Appellants shared information, drug connections, and proceeds of their drug trafficking. Second, the record shows that Appellants assigned territory to each member, thereby avoiding competition, and other members would assist a member to resolve a territorial dispute. For instance, at the videotaped January 4, 1995 meeting, the members present tried to resolve a territorial dispute between Arias and co-defendant Sammy Villalba because both had drug dealers working in the same area.

Third, the record shows that Appellants used the reputation and violence of the Mexican Mafia to establish control over their territories. For example, the murders and attempted murders of Ana Lizarraga, Manuel Luna, Ricardo Gonzales, Humberto Madrigal, Eduardo Soriano, and Conrad Morales all stemmed from their interference with Gallardo's drug trafficking in Ramona Gardens. Aguirre, Arias, Therrien, and others helped Gallardo carry out these crimes.

After gaining control over a territory, Appellants also aided and abetted narcotics trafficking by providing protection and territorial monopolies to drug dealers in exchange for extorted payments (taxes). For example, E. Castro testified that a drug dealer named "Joanna" agreed to pay the Mexican Mafia $15,000 over a six-month period, to be split between Aguirre, Rodriguez, and E. Castro, in return for protection and the right to sell drugs in a specific area. In a recorded telephone conversation on May 19, 1994, Rodriguez told E. Castro that besides the $15,000 payment from Joanna, each of her drug dealers were going to pay the Mexican Mafia $50 a week. In a recorded meeting on May 24, 1994, a Mexican Mafia associate delivered $900 from Joanna's dealers to E. Castro and Rodriguez. In addition, in a recorded meeting on June 1, 1994, Joanna delivered $7,000 to E. Castro and Rodriguez.

#### b. Narcotic Distribution in California's Jails and Prisons

Appellants also aided and abetted the distribution of narcotics in California's jails and prisons. For example, in a recorded telephone call on March 21, 1995, two Mexican Mafia associates called J. Hernandez from the Los Angeles County Jail and informed him that all of Gallardo's drugs had arrived at the jail, and that approximately $2,500 from the sale of those drugs had been collected on Gallardo's behalf.

The indictment charged conspiracy to aid and abet the distribution of narcotics as a racketeering act, and the jury found the crime proven as to all Appellants except Moreno. The jury also convicted the same Appellants of conspiracy to aid and abet the distribution of narcotics.

### 17. *Conspiracy to Extort*

Overwhelming evidence in the record shows that Appellants conspired to extort money and firearms from various street gangs. Audiotaped and videotaped conversations, and E. Castro's testimony, showed that the Mexican Mafia exerted control over street gangs by setting rules of engagement (such as no drive-by shootings) and mediating disputes between street gangs. The Mexican Mafia also extorted regular payments of money and firearms from street gangs. If a gang refused to pay the "tax," the Mexican Mafia attacked or allowed attacks by other street gangs against the offending gang. This meant that members of the offending gang were attacked on the street and in jail until the street gang agreed to pay the tax.

The indictment charged conspiracy to extort as a racketeering act, and the jury found the crime proven as to all Appellants except Mendez and Moreno. The jury also convicted the same Appellants of conspiracy to extort.

### DISCUSSION

On appeal, Appellants make numerous challenges to their convictions and sentences. We address each challenge in turn. We affirm Appellants convictions and sentences, except that we remand R. Hernandez's sentence for re-sentencing.

## I Jury Empanelment and Scope of Hearing on Juror Misconduct

Appellants argue that (1) the district court erred by sua sponte empaneling an anonymous jury; and (2) the district court abused its discretion by limiting the scope of a hearing on alleged juror misconduct.

### A. Anonymous Jury

On August 15, 1996, the district court sua sponte empaneled an anonymous jury by ordering that the names, addresses, and places of employment of prospective jurors and their spouses not be disclosed to counsel, either before or after selection of the jury panel. Normally, the parties have this information and use it during voir dire to formulate questions probing for potential biases, prejudices, or any other consideration that might prevent a juror from rendering a fair and impartial decision. Appellants contend that the district court erred by empaneling an anonymous jury. We disagree.

Whether a district court can empanel an anonymous jury is an issue of first impression in this circuit, but our analysis is guided by the standards developed in other circuits. Every circuit that has addressed this issue has held that a lower court's decision to empanel an anonymous jury is entitled to deference and is subject to abuse of discretion review. *United States v. DeLuca*, 137 F.3d 24, 31 (1st Cir.1998); *United States v. Thai*, 29 F.3d 785, 801 (2d Cir.1994); *United States v. Thornton*, 1 F.3d 149, 153 (3d Cir.1993); *United States v. Krout*, 66 F.3d 1420, 1426 (5th Cir.1995); *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir.1999); *United States v. Mansoori*, 304 F.3d 635, 650 (7th Cir.2002); *United States v. Darden*, 70 F.3d 1507, 1532–33 (8th Cir.1995); *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir.1994); *United States v. Childress*, 58 F.3d 693, 702–03 (D.C.Cir.1995) (per curiam) (rejecting a de novo standard of review because the decision to empanel an

anonymous jury "require[s] a trial court to make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings"). We, too, adopt the abuse of discretion standard of review and will afford deference to the district court's decision to empanel an anonymous jury. In determining whether the district court abused its discretion, we may consider evidence available at the time the district court empaneled the anonymous jury, and all relevant evidence introduced at trial. *DeLuca*, 137 F.3d at 31; *Krout*, 66 F.3d at 1427.

■ We recognize that empaneling an anonymous jury is an unusual measure that is warranted only where there is a strong reason to believe the jury needs protection or to safeguard the integrity of the justice system, so that the jury can perform its factfinding function. *DeLuca*, 137 F.3d at 31. As Appellants correctly note, anonymous juries may infer that the dangerousness of those on trial required their anonymity, thereby implicating defendants' Fifth Amendment right to a presumption of innocence. Also, as Appellants correctly note, the use of an anonymous jury may interfere with defendants' ability to conduct voir dire and to exercise meaningful peremptory challenges, thereby implicating defendants' Sixth Amendment right to an impartial jury. We nevertheless agree with our sister circuits that the use of anonymous juries is permissible in limited circumstances. Accordingly, we now adopt the rule as articulated by the First Circuit: the trial court may empanel an anonymous jury "where (1) there is a strong reason for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." *Id.*

The fact that the district court sua sponte empaneled an anonymous jury does not change the analysis. *United States v. Branch*, 91 F.3d 699, 723–25 (5th Cir.1996) (affirming the district court's sua sponte order to empanel an anonymous jury); *United States v. Bowman*, 302 F.3d 1228, 1236 (11th Cir.2002) (per curiam) (same); *United States v. Edmond*, 52 F.3d 1080, 1089–94 (D.C.Cir.1995) (per curiam) (same). Because the purpose of an anonymous jury is to protect that jury and the integrity of the justice system, and is permissible so long as the district court takes reasonable precautions to safeguard the defendants' rights, no principle would distinguish an order to empanel an anonymous jury made sua sponte from one based on a party's motion.

■ Courts have recognized the need for jury protection based on some combination of factors, including: (1) the defendants' involvement with organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that the defendants will suffer a lengthy incarceration if convicted; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment. *DeLuca*, 137 F.3d at 31–32; *United States v. Brown*, 303 F.3d 582, 602 (5th Cir.2002); *Talley*, 164 F.3d at 1002; *Mansoori*, 304 F.3d at 650–51; *Darden*, 70 F.3d at 1532; *Bowman*, 302 F.3d at 1238; *Edmond*, 52 F.3d at 1091. These factors are neither exclusive nor dispositive, and the district court should make its decision based on the totality of the circumstances. *Brown*, 303 F.3d at 602.

Here, the district court found that the jury needed protection because all five factors were met. The record amply sup-

ports this conclusion. First, the record shows that Appellants were involved with the Mexican Mafia, an extraordinarily violent organized criminal enterprise. *Cf. Mansoori*, 304 F.3d at 649 (holding that the district court erred by empaneling an anonymous jury where the district court's principal concerns about the prospect of interference with jurors were based on his experience with another trial involving a gang unrelated to the gang to which the defendants belonged, but finding the error harmless because: (1) the district court conducted a thorough voir dire protecting the defendants' right to an unbiased jury; (2) the district court's instructions to the jury during voir dire and the trial emphasized that the defendants' were presumed innocent; and (3) the record contained a basis for concern over juror security); *United States v.Vario*, 943 F.2d 236, 241 (2d Cir.1991) (noting that "[t]he invocation of the words 'organized crime,' 'mob,' or 'Mafia,' unless there is something more, does not warrant an anonymous jury," but the " 'something more,' " which by itself is sufficient to justify an anonymous jury, "can be a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety").

Second, the record shows Appellants' involvement on behalf of the Mexican Mafia in several murders, attempted murders, and conspiracies to commit murder. At the time of trial, there were hundreds of Mexican Mafia members and associates still at large. Clearly, the Mexican Mafia was a group with the capacity to harm jurors.

Third, the record shows that Appellants had previously attempted to interfere with the judicial process by testifying falsely and threatening, assaulting, killing, or attempting to kill potential witnesses in other cases. For instance, E. Castro testified that members of the Mexican Mafia maintained a "code of silence" obligating members testifying in court to deny the existence of and membership in the Mexican Mafia. The record also shows that Aguirre threatened Humberto Madrigal not to identify Gallardo as the person who shot him. The most obvious interference with the judicial process occurred when members of the Mexican Mafia blatantly subpoenaed individuals to penal institutions under the guise of needing them as witnesses in their case, then attacked those persons in attorney visiting rooms.

Fourth, all Appellants faced lengthy incarceration if convicted. In fact, Appellants received sentences ranging from 384 months to life plus 300 months. *See De-Luca*, 137 F.3d at 32 (finding the mandatory life sentences defendants faced if convicted "surely provided a strong inducement to resort to extreme measures in any effort to influence the outcome of the trial"). Finally, a trial involving several alleged members and associates of the Mexican Mafia could expect to receive extensive publicity, enhancing the possibility that jurors' names would become public and expose them to intimidation and harassment.

Moreover, the district court took reasonable precautions to minimize any risk of infringement on Appellants' fundamental rights. Appellants allege that the use of an anonymous jury was prejudicial because it reinforced any preconceived impression the jurors might have had about the dangerousness of the Appellants. The district court, however, instructed the jury that the reason for their anonymity was to protect their privacy from curiosity-seekers. *See Darden*, 70 F.3d at 1530 (holding that the district court took reasonable pre-

cautions to protect the defendants' fundamental rights when it told the jurors that it would not release their names to avoid harassment from the media). Also, the district court instructed the jury that the use of anonymous juries was commonplace in federal court, and that the reasons for the use of such a jury here had nothing to do with the Appellants' guilt or innocence. *See Ross*, 33 F.3d at 1521–22 (holding that the district court's instruction to the jury that their anonymity was to insulate them from improper communication from either side and was not a reflection on the defendant "eviscerated any possible inference of Appellant's guilt arising from the use of an anonymous jury"). Accordingly, we hold that the district court did not abuse its discretion by empaneling an anonymous jury in this case.

**B. Scope of Hearing of Alleged Juror Misconduct**

■■■■■ We review for an abuse of discretion the district court's decisions regarding incidents of jury misconduct. *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir.1998). We review for clear error the district court's factual findings relating to the issue of juror misconduct. *United States v. Matta–Ballesteros*, 71 F.3d 754, 766 (9th Cir.1995), *as amended by* 98 F.3d 1100 (9th Cir.1996).

The verdicts were filed on Friday, May 30, 1997. On the following Monday morning, the press officer for the United States Attorney's Office received a phone call from an individual claiming that Juror 69 discussed the case publicly during trial. The district court held a hearing on June 17, 1997, where it questioned the press officer and Juror 69. At the hearing, the press officer stated that he had only one telephone conversation for approximately four minutes with the caller (referred to as person "B"). B told the press officer that Juror 69 had discussed his role on the jury with person "A." B also told the press

officer that B was acquainted with A and not Juror 69, and had no first-hand knowledge of the communications between Juror 69 and A.

The court then questioned Juror 69. Juror 69 stated that he had told five work supervisors that he had to cancel certain work commitments because he was a juror, and identified the trial for which he served as a juror. During the hearing, Juror 69 repeatedly and unequivocally stated that (1) he did not know B, (2) he had no direct contact with A concerning the trial, (3) any information he provided his employers that they may have conveyed to A was limited to the fact of his service on the jury, and (4) he did not receive extrinsic information about the trial from his employers.

The district court ruled that Juror 69 was credible, and that the communications did not rise to the level of misconduct because they were limited to Juror 69's need to be in court for jury service. Furthermore, the district court ruled that even if the communications constituted misconduct, no prejudice resulted from the communications.

Appellants argue that the district court abused its discretion by not revealing the identities of A, B, and Juror 69, thereby precluding a full investigation of the misconduct allegations. We have previously held that when a district court holds a hearing in response to allegations of juror misconduct, "[t]he district court has discretion to determine the extent and nature of the hearing." *Price v. Kramer*, 200 F.3d 1237, 1254 (9th Cir.2000); *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977) (finding that "a trial judge in making these decisions will necessarily be directed by the content of the allegations, including the seriousness of the alleged misconduct or bias, and the credibility of the source"). Because of the facts presented in the record and the district court's finding of Juror

69's credibility, we hold that the district court's decision concerning the nature of the evidentiary hearing was not an abuse of discretion.

## II Constitutional Right to a Public Trial and Courtroom Security Procedures

■ Appellants contend that the limited audience seating in the courtroom amounted to a *"de facto* closed courtroom" that violated their right to a public trial, a right guaranteed by the Sixth Amendment and emphasized in *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). Specifically, Appellants claim that given the number of defendants, counsel, jurors, and alternates, the space dedicated to electronic machinery used to play audio and videotapes for the jury, and that the chairs in the courtroom were frequently taken by members of the press, there remained inadequate seating for Appellants' family members. They assert also that security measures exacerbated the situation by discouraging Appellants' family members from attending the trial. These security measures were established by the district court in a November 16, 1995 order, which required everyone attending the trial to pass through a metal detector, show identification, and sign a log-in form.

■ We review de novo a Sixth Amendment claim for violation of defendants' right to a public trial. *United States v. Ivester,* 316 F.3d 955, 958 (9th Cir.2003). We review for an abuse of discretion the district court's decision to impose security measures. *Wilson v. McCarthy,* 770 F.2d 1482, 1485 (9th Cir.1985); *see also United States v. Evans,* 272 F.3d 1069, 1093 (8th Cir.2001) ("[t]he need for and extent of security measures in a courtroom during trial are within the sound discretion of the trial court").

■ "The denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom." *United States v. Al Smadi,* 15 F.3d 153, 155 (10th Cir.1994) (citations omitted). Accordingly, a defendant's right to a public trial is only implicated by a "closure." *See Ivester,* 316 F.3d at 959–60 (holding that some closures are too trivial to implicate the Sixth Amendment right to a public trial, and finding (1) the closed courtroom discussions between the district court and counsel concerning how to handle the questioning of jurors, and (2) midtrial questioning of a juror in a closed courtroom with counsel and defendant present were trivial closures that did not violate the right to a public trial).

In *Estes v. Texas,* 381 U.S. 532, 588–89, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), Justice Harlan stated in concurrence:

> Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats.... A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process.

*See also United States v. Kobli,* 172 F.2d 919, 923 (3d Cir.1949) (stating that the constitutional right to a public trial does not require holding trial in a place large enough to accommodate all those who desire to attend).

We hold that the size of the courtroom did not amount to a "closure," and therefore did not implicate Appellants' Sixth Amendment right to a public trial. Appellants' trial was always open to the public. Specifically, the district court always allowed Appellants' family members and the general public to use the available seating. Appellants only point to two occasions were there was insufficient seating for family members, (1) when the jury re-

ceived their questionnaires, and (2) at the return of the verdict. In fact, before opening statements, the district court noted that "the greater bulk of the chairs in the last three rows are basically reserved for the public including the family. I'm glad to see that there are still vacant chairs available in that sector. Although there was a hue and cry that family members would not be accommodated." Appellants did not have a Sixth Amendment right to force the district court to expand what was sufficient courtroom seating to accommodate family members who did not attend the trial.

We hold also that the district court did not abuse its discretion by imposing appropriate security measures. The district court's security measures were eminently reasonable in light of the large number of defendants, the allegations of extraordinarily violent crimes committed by the defendants, and the Mexican Mafia's history of using violent actions to disrupt the judicial process. Requiring members of the public to proceed through a metal detector, show identification, and sign a log-in form are similar to the security methods used in many government and private office buildings in this country.

## III Motions to Suppress the Wiretap and Videotape Evidence

### A. Wiretap Evidence

On September 22, 1994, the district court authorized the interception of wire communications on J. Hernandez's telephone. Various district judges subsequently approved seven applications for continued authority to maintain the wiretap. The subsequent applications incorporated a forty-five-page affidavit ("Affidavit") submitted by FBI Agent Joseph C. Ways ("Agent Ways") in support of the original wiretap. The wiretap terminated on May 2, 1995.

Appellants contend that the Affidavit did not satisfy the necessity requirement for issuing a wiretap. Appellants contend also that the district court erred by denying them a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to determine whether Agent Ways made false statements in the Affidavit. We disagree.

We review motions to suppress de novo. *United States v. Jones,* 286 F.3d 1146, 1150 (9th Cir.2002). We review de novo whether the government submitted the requisite full and complete statement of facts in compliance with 18 U.S.C. § 2518(1)(c), and review for an abuse of discretion the district judge's decision that the wiretap was necessary. *United States v. Blackmon,* 273 F.3d 1204, 1207 (9th Cir.2001). Moreover, we review de novo the district court's denial of a *Franks* hearing, and review for clear error the district court's underlying finding that the government did not intentionally or recklessly make false statements. *United States v. Jordan,* 291 F.3d 1091, 1099 (9th Cir.2002); *United States v. Reeves,* 210 F.3d 1041, 1044 (9th Cir.2000).

### 1. The Affidavit

To establish that a wiretap is necessary, the application must provide a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The issuing judge must then determine whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

The Affidavit averred that normal investigative procedures had been tried and failed, and reasonably appeared to be un-

likely to succeed or were too dangerous. The Affidavit stated that traditional investigative techniques were unlikely to "reveal the full nature and extent of the criminal activities of all of the major participants in [the Mexican Mafia] and to gather sufficient evidence to successfully prosecute the participants for the target offenses." In addition, the Affidavit stated that the government had used seven cooperating individuals in the investigation who had provided "a wealth of information and evidence," but "are not likely to realize[ ] all of the investigative objectives."

With respect to E. Castro and his help in recording meetings with the Mexican Mafia members and associates, the Affidavit in which E. Castro was referred to CW # 1 stated:

> With CW # 1's assistance, the investigating agents have succeeded in consensually monitoring and recording numerous contacts with members of the Mexican Mafia. However, CW # 1 is not [in] a position to be privy to all of the activities of the targets of this investigation. In particular, CW # 1 cannot control, nor be a participant in, the numerous telephone calls being made from the county jail to and through the [s]ubject [t]elephone or the numerous calls made from the subject telephone to people other than CW # 1.

In regards to inmates' telephone calls, the Affidavit stated: "The telephone calls made by inmates from the Los Angeles [County] jail are not monitored or recorded on a regular basis. Therefore, consensual recordings of these conversations are not available to the government for use in this case."

Appellants contend that the Affidavit failed to satisfy the necessity requirement because it misrepresented the success of normal investigative techniques. Specifically, Appellants contend that the Affidavit failed to disclose the government's video surveillance of Appellants' meetings.

We have reviewed the factual allegations of the Affidavit as a whole. Although not a flawless affidavit, we hold that the Affidavit was sufficient to support a reasonable judge's conclusion that the necessity requirement was satisfied. The Affidavit stated that the government had monitored and recorded numerous contacts between Mexican Mafia members. Moreover, the Mexican Mafia is a broad-based organization with several hundred members and an unknown number of associates. Several informants—including former members of the Mexican Mafia such as E. Castro—could not possibly reveal the full nature and extent of the enterprise and its countless, and at times disjointed, criminal tentacles. *Compare United States v. McGuire*, 307 F.3d 1192, 1196–99 (9th Cir. 2002) (holding that necessity existed despite the existence of informants because infiltration alone could not determine the scope of the conspiracy), *with United States v. Ippolito*, 774 F.2d 1482, 1486–87 (9th Cir.1985) (holding that necessity was absent where an informant existed within the organization who was willing to testify and had the potential for uncovering the *entirety* of the conspiracy under investigation).

### 2. *Franks* Hearing

Appellants contend that the district court erred by denying them a *Franks* hearing. Specifically, Appellants assert a *Franks* hearing was appropriate because the Affidavit: (1) omitted material information regarding the value of E. Castro's cooperation and the government's video surveillance of Appellants' meetings; (2) stated that the government needed a wiretap to record inmates calls; and (3) relied on an informant, identified as CW # 1, but

did not disclose that CW # 1 was E. Castro.

A *Franks* hearing is appropriate where the defendant makes a substantial preliminary showing that a false statement was (1) deliberately or recklessly included in an affidavit submitted in support of a wiretap, and (2) material to the district court's finding of necessity. *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000).

Because Appellants do not meet either threshold requirement, we hold that the district court correctly denied Appellants' motion for a *Franks* hearing. First, the district court ruled that Appellants did not make a substantial showing that the government had made intentional or reckless misrepresentations or omissions in the Affidavit. Appellants have not provided any facts on which we could find that the district court clearly erred. In fact, the opposite is true. Contrary to Appellants' contention, the Affidavit stated that the informants had produced a "wealth of information and evidence," that with the help of CW # 1 the government had monitored and recorded "numerous" meetings with Mexican Mafia members, and that inmates' telephone calls were not available because those calls were not monitored on a "regular" basis.

Second, even assuming the Affidavit contained the misleading statements and omissions asserted by Appellants, those statements and omissions were not necessary to the district court's finding of necessity. Even if the Affidavit disclosed E. Castro's identity, more robustly described his contributions, and acknowledged that the County Jail calls were sometimes monitored, the district court would still have been reasonable to find the wiretap necessary. As mentioned above, the Mexican Mafia is a broad-based organization and investigators were unlikely to discovery the full nature and extent of the enterprise without wiretaps.

**B. Videotape Evidence**

Pursuant to E. Castro's consent, the government videotaped fourteen meetings of Mexican Mafia members between March 27, 1994 and April 9, 1995. All fourteen meetings took place in hotel rooms. On most occasions, E. Castro rented the hotel rooms. Appellants allege that Shryock rented the hotel room for the August 28, 1994 meeting and that Barela rented the room on "another" occasion. Before trial, Appellants moved to suppress the videotapes. Appellants argued before the district court and now on appeal that the warrantless videotaping of those meetings violated Appellants' Fourth Amendment right to be free from unreasonable searches and seizures. The district court denied Appellants' motion to suppress, holding that because E. Castro consented to the videotaping, Appellants did not have an objectively reasonable expectation of privacy and therefore the Fourth Amendment did not protect them from being video recorded.

We review motions to suppress de novo. *Jones*, 286 F.3d at 1150. We review for clear error the district court's underlying factual findings, and review de novo the lawfulness of a search and seizure. *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir.2000). We review de novo whether a citizen's expectation of privacy was objectively reasonable. *Id.*

The videotapes contained both video and audio portions. The audio portions are governed by the federal wiretap statute, 18 U.S.C. §§ 2510 et seq., which contains an exception permitting warrantless audio-recording where one of the participants in the monitored conversation consents. 18 U.S.C. § 2511(2)(c). E. Castro consented to the videotapes. Thus,

under the statutory exception of § 2511(2)(c), the audio portions of the videotapes would be admissible. Those portions must also be admissible under the Constitution. *United States v. Keen*, 508 F.2d 986, 989 (9th Cir.1974) (holding that to be admissible, wiretap evidence must be "obtained in violation of neither the Constitution nor federal law"). We need not decide this constitutional issue because, as we conclude hereafter, any error in admitting the videotapes, which included the audio portions, was harmless beyond a reasonable doubt as to the only Appellants with standing to challenge their admissibility. *Cf. United States v. Padilla*, 520 F.2d 526, 527–28 (1st Cir.1975); *United States v. Yonn*, 702 F.2d 1341, 1346–47 (11th Cir. 1983).

■■■■■ Turning to the admissibility of the video portions of the videotapes, the Fourth Amendment protects people not places. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). To invoke the Fourth Amendment protections, a person must show that he had a legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). A person demonstrates a legitimate expectation of privacy when that person has a(1) subjective expectation of privacy, and (2) an objectively reasonable expectation of privacy. *Id.* Moreover, a person's expectation of privacy may depend on the nature of the intrusion. *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

In *Nerber*, we analyzed the circumstances under which secret videotaping of events occurring in a hotel room may be justified under the Fourth Amendment. 222 F.3d 597. There, the FBI and local police rented a hotel room and installed a hidden video camera without obtaining a warrant. *Id.* at 599. Informants brought the defendants to the hotel room to conduct a narcotics transaction. *Id.* The videotape captured six minutes of the informants and defendants engaging in the narcotics transaction, and three hours of the defendants' activity in the hotel room after the informants left. *Id.* We noted that the intrusion was severe, but stated that "[the defendants] were not 'residents' of the hotel, they were not overnight guests of the occupants, and they were there solely to conduct a business transaction at the invitation of the occupants, with whom they were only minimally acquainted." *Id.* at 604. As a result, we held that the defendants did not have an objectively reasonable expectation of privacy when the informants were present because (1) the informants consented to the videotaping, (2) and the defendants bore the risk that the government was monitoring their activities with the informants. *Id.* We also held, however, that the Fourth Amendment protected against the warrantless video surveillance that continued after the informants left the premises. *Id.* at 606.

*Nerber* governs the video recordings made when E. Castro rented the hotel room. Although the video recordings were for longer periods than those in *Nerber*, and captured some peripheral conversations that did not strictly concern the Mexican Mafia, *Nerber* turns on the fact that the defendants in that case came to the hotel room to conduct a drug transaction and bore the risk that the other parties were informants. Here, Appellants were present at the hotel rooms to conduct the criminal business of the Mexican Mafia, and they bore the risk that one of their members was an informant. In any human conversation, there is some peripheral discussion of matters not pertaining to the main subject of the conversation (such as asking how one's family is doing). In addition, the videotape only recorded while the informant, E. Castro, was present.

■ *Nerber*, however, left open the novel issue of whether defendants had an objectively reasonable expectation of privacy where an informant consented to the video recording, but the hotel room was rented by one of the defendants.[5] It is not necessary to decide this constitutional issue because assuming the videotape was unconstitutional, the error is clearly harmless beyond a reasonable doubt as to Shryock and Barela, the Appellants who rented the rooms on two occasions and thus had standing. Any evidence flowing from this error was inconsequential when reviewed in light of the overwhelming evidence of their guilt.

■ Appellants challenge also the district court's conclusion that E. Castro consented to the video recordings. The district court found that E. Castro consented to the videotape surveillance, based on the testimony of a law enforcement officer. E. Castro also testified at trial that he consented to the video recordings. Appellants argue that the government failed to carry its burden to show consent because E. Castro was a drug addict undergoing methadone treatment and he could not voluntarily consent. Appellants, however, do not offer any evidence to refute consent. Rather, they merely argue that the government did not meet its burden. Thus, we conclude that the district court did not clearly err by holding that E. Castro consented.

## IV The District Court's Trial Rulings

### A. Rulings Regarding Cross Examination

Appellants contend that the district court erred by issuing rulings that limited their cross-examination of several witnesses. We disagree.

### 1. Deputy Valdemar

■ Pursuant to Federal Rule of Evidence 705, Appellants moved that the district court order Deputy Valdemar to produce the records and identity of informants on which he relied in giving his expert testimony. The records sought were held by the California Department of Corrections ("CDC"), which was not a member of the task force investigating Appellants. Appellants argue that the district court's denial of this motion limited their cross-examination of Deputy Valdemar so severely as to violate their constitutional right to confront witnesses testifying against them.

■ Whether limitations on cross-examination are so severe as to violate the Confrontation Clause is a question of law we review de novo. *United States v. Adamson*, 291 F.3d 606, 612 (9th Cir.2002). Confrontation Clause violations are subject to harmless error analysis. *United States v. Orellana–Blanco*, 294 F.3d 1143, 1148 (9th Cir.2002).

We need not decide the constitutional issue because assuming that the district

---

**5.** Appellants point to dicta in a footnote in *Nerber*, where we stated:

> We do not intend to imply that video surveillance is justifiable whenever an informant is present. For example, we suspect an informant's presence and consent is insufficient to justify the warrantless installation of a hidden video camera in a suspect's home. We hold only that when defendants' privacy expectations were already substantially diminished by their presence in another person's room to conduct a brief business transaction, the presence and consent of the informants was sufficient to justify surveillance.

222 F.3d at 604 n. 5. The majority's dicta makes clear that the panel was not addressing whether an informant's consent is sufficient to allow warrantless videotaping in all circumstances, such as where the defendant rents the hotel room.

court's refusal to require Deputy Valdemar to produce the CDC records and identity of informants on which he relied violated the Appellants' constitutional rights of confrontation, the error was harmless. The government offered Deputy Valdemar's testimony solely to describe the history and operation of the Mexican Mafia, and identify Appellants as members or associates of the Mexican Mafia. The government had an overwhelming case without this testimony. Specifically, the video recordings, wiretaps, consensual recordings, prison tapes, and testimony of other witnesses, such as E. Castro, provided ample evidence of the existence and practices of the Mexican Mafia and each Appellant's participation in its activities. *See United States v. Bowman*, 215 F.3d 951, 961 (9th Cir.2000) ("Evidence erroneously admitted in violation of the Confrontation Clause must be shown harmless beyond a reasonable doubt, with courts considering the importance of the evidence, whether the evidence was cumulative, the presence of corroborating evidence, and the overall strength of the prosecution's case").

### 2. E. Castro and Law Enforcement Officers

▆▆ Appellants contend that the district court improperly sustained objections to their cross-examination of E. Castro and various law enforcement witnesses as argumentative. They contend also that the district court precluded them from impeaching E. Castro about several alleged prior inconsistent statements. We review for an abuse of discretion the district court's limitation of cross-examination. *United States v. Castellanos–Garcia*, 270 F.3d 773, 775 (9th Cir.2001).

▆▆ Appellants point to several instances where the district court sustained the government's objection to Appellants' questions on cross-examination of E. Castro and various law enforcement witnesses.

A review of the instances cited by Appellants shows that the district court properly sustained the objections as argumentative, and did not abuse its discretion. For example, the following colloquy took place during Appellants' cross-examination of E. Castro:

> Q. Mr. Castro, isn't that exactly what you did in this case, didn't you act like a friend with various of the individuals who are charged here and then you stabbed everyone in the back by going to the government and telling stories?
>
> [Government]: Objection, Your Honor; argumentative.
>
> The Court: Sustained.

Sustaining the government's objection to this question as argumentative was not an abuse of discretion.

▆▆ Appellants point also to several instances where the district court allegedly precluded them from impeaching E. Castro with alleged prior inconsistent statements. A review of these instances does not support Appellants' argument. For example, E. Castro testified during cross-examination that around December 16, 1994, he obtained a 9 millimeter handgun from J. Hernandez, and that he did not record conversations between himself and J. Hernandez about the gun. E. Castro testified further that he knew he did not have permission to obtain the weapon, and that he did not record the conversations because he did not have immunity from prosecution if the officers found out about his possession of the gun. Finally, E. Castro testified that he obtained an M1 rifle from J. Hernandez and also failed to record that conversation.

During Appellants' case-in-chief, Appellants asked FBI Agent Myers whether E. Castro tape-recorded these particular conversations. Appellants then asked Agent Myers whether E. Castro recorded other conversations between himself and J. Her-

nandez, and the district court sustained the government's objection that the questions were cumulative and constituted improper impeachment under Federal Rule of Evidence 608(b). Rule 608(b) prohibits the introduction of specific instances of conduct of a witness to attack or support the credibility of that witness.

On appeal, Appellants contend that they were trying to impeach E. Castro's statement that he did not recall whether he recorded the conversations regarding the 9 millimeter handgun and M1 rifle. As discussed above, however, E. Castro testified that he did not record the conversations. Appellants simply misread the record. Because E. Castro testified that he did not record his conversations concerning the gun, the district court correctly denied Appellants an opportunity to elicit testimony from Agent Myers showing that E. Castro failed to record those conversations under the guise that E. Castro made prior inconsistent statements.

**B. Evidentiary Rulings**

 Shryock and Gallardo contest certain evidentiary rulings made by the district court. We review for an abuse of discretion the district court's evidentiary rulings during trial, including the exclusion of evidence under the hearsay rule. *United States v. Parks,* 285 F.3d 1133, 1138 (9th Cir.2002); *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002). We review for an abuse of discretion the district court's decision to admit coconspirators' statements, and review for clear error the district court's underlying factual determinations that a conspiracy existed and that the statements were made in furtherance of that conspiracy. *Bowman,* 215 F.3d at 960.

**1. Shryock**

 The indictment charged Shryock with the murder of Albert Orosco and attempted murder of Hector Galvez, whom

Larry Hernandez shot at Hernandez's residence in Chino, California. Hernandez told police he shot the victims in self-defense. Hernandez was not available for trial, and Shryock sought to introduce Hernandez's statement under the declaration against-penal-interest and residual exceptions to the hearsay rule. The district court ruled that the statement was inadmissible.

*a. Statement Against Penal Interest*

Federal Rule of Evidence 804(b)(3) is an exception to the hearsay rule that provides for the admissibility of statements when the proponent shows that: "(1) the declarant is unavailable as a witness; (2) the statement so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he believes it to be true; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Paguio,* 114 F.3d 928, 932 (9th Cir.1997). The government concedes that the first element is satisfied.

The district court did not abuse its discretion by excluding Hernandez's statement that he shot the victims in self-defense because the statement was exculpatory, and not against his penal interest. In *Paguio,* we stated that the statement at issue must be "examined in context, to see whether as a matter of common sense the portion at issue was against interest and would not have been made by a reasonable person unless he believed it to be true." *Id.* at 934. Obviously, this test is not met here. Hernandez could have made the statement to serve his own penal interest—self defense would absolve him of criminal liability—and not because he believed the statement to be true. *See, e.g., LaGrand v. Stewart,* 133 F.3d 1253, 1268 (9th Cir.

1998) (noting that the reliability that attends a declarant's inculpatory statement does not afford any reliability to the part of the statement that merely exculpates another person).

### b. *Residual Hearsay Exception*

Federal Rule of Evidence 807 is an exception to the hearsay rule that provides for the admissibility of statements that have "equivalent circumstantial guarantees of trustworthiness" as the other hearsay exceptions. The district court did not abuse its discretion by excluding Hernandez's statement under this exception because the statement did not have circumstantial guarantees of trustworthiness-Hernandez was merely exculpating himself. It is clear that Larry Hernandez's words were so unreliable that there was a need to subject them to adversarial testing in a trial setting.

### 2. Gallardo

 Gallardo argues that the district court erred by admitting audio recordings of statements Peters made to his mother, Paz Gutierrez, that Gallardo murdered Manuel Luna and Ricardo Gonzales. The district court admitted this evidence under Federal Rule of Evidence 801(d)(2)(E), which excludes from the definition of "hearsay" those statements made by a co-conspirator during the course and in furtherance of the conspiracy.

Gallardo argues that the statements were mere "idle conversation," and not in furtherance of the conspiracy. *See United States v. Bibbero,* 749 F.2d 581, 584 (9th Cir.1984) (holding that idle conversation is not in furtherance of the conspiracy). However, Gallardo has not pointed us to any facts on which we could find that the district court clearly erred.

 Gallardo also argues that the district court improperly allowed the government to call Humberto Madrigal solely to impeach him with his prior identification as a guise to use the hearsay statement as substantive evidence against Gallardo. *United States v. Crouch,* 731 F.2d 621, 623 (9th Cir.1984). The indictment charged Gallardo with the attempted murder of Madrigal. At trial, Madrigal testified that he was shot but could not identify his assailant or pick out the assailant from a photo lineup. Madrigal testified also that at Gallardo's parole revocation hearing he testified that Gallardo did not shoot him. On cross-examination, Madrigal again testified that he could not identify the assailant. Subsequently, the government called LAPD Detective Martinez who testified that Madrigal identified Gallardo as the assailant during an interview at the hospital, and when shown a later photo line-up at Madrigal's home.

Madrigal's prior identification of Gallardo was admissible nonhearsay under Federal Rule of Evidence 801(d)(1)(C), which permits out-of-court statements of identification of a person if the declarant is subject to cross-examination. Thus, the district court did not abuse its discretion by admitting the evidence of Madrigal's prior identification.

## V Motion to Unseal and the District Court's Discovery Rulings

### A. Motion to Unseal

On November 23, 1998, we entered an order remanding to the district court for the limited purpose of considering whether Appellants' request to unseal documents filed by the government under seal and in camera should be granted. Subsequently in response to a district court order, Appellants identified 583 sealed and in camera documents at issue, of which 145 were arguably filed under seal or in camera by the government. On May 29, 2000, the district court entered an order unsealing several documents and retaining others

under seal. On January 24, 2001, Appellants filed with this court a renewed motion to unseal the filings. On April 13, 2001, we denied the motion without prejudice to raising the issue in the opening briefs.

▉▉▉▉ Although Appellants creatively argue for a constitutional right of access, they are clearly challenging the district court's discovery rulings regarding sealed and in camera documents. We review a district court's discovery rulings for an abuse of discretion. *United States v. Chon*, 210 F.3d 990, 994 (9th Cir.2000). We review for clear error the district court's decision to refuse a defendant access to information in a government document produced pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *United States v. Monroe*, 943 F.2d 1007, 1011 (9th Cir. 1991). We review for an abuse of discretion the district court's denial of a motion to produce documents pursuant to the Jencks Act. *United States v. Guagliardo*, 278 F.3d 868, 871 (9th Cir.2002). Because the district court has the inherent power to seal documents, we review for an abuse of discretion the district court's decision to retain filings under seal. *United States v. Mann*, 829 F.2d 849, 853 (9th Cir.1987).

We have reviewed *every* document filed under seal or in camera, and conclude that the district court did not err.

## B. Discovery Rulings

▉▉▉▉ We review for an abuse of discretion the district court's discovery rulings. *Chon*, 210 F.3d at 994. "To reverse a conviction for a discovery violation, we must find not only that the district court abused its discretion, but that the error resulted in prejudice to substantial rights." *United States v. Amlani*, 111 F.3d 705, 712 (9th Cir.1997). We review de novo challenges to convictions based on alleged *Brady* violations. *United States v. Smith*, 282 F.3d 758, 770 (9th Cir.2002).

▉▉▉▉ First, Appellants contend that the district court abused its discretion by issuing protective orders for certain discovery materials, whereby the government provided defense counsel with one copy of the covered documents to be kept in a secure location accessible only to defense counsel. The district court issued five protective orders encompassing: (1) twenty-five pages; (2) seven pages; (3) ten pages; (4) a copy of the transcript of the proceeding concerning the first wiretap; and (5) early production of certain witness statements. The covered documents were a minuscule portion of the entire discovery for an eight-month trial, and simply do not support Appellants' contention that they were "crippled" by these protective orders. After reviewing the record, we conclude that the district court did not abuse its discretion by issuing the protective orders.

Appellants contend also that they were hampered by the government's late discovery responses to which the district court acquiesced. However, Appellants only cite a few isolated instances that do not rise to the level of discovery violations. The district court did not abuse its discretion.

▉▉▉▉ Finally, Appellants maintain that the district court erred by ruling that the government did not have to produce an alleged CDC debriefing of E. Castro in the CDC's possession. Prosecutors must turn over *Brady* materials when the prosecutors have knowledge of and access to the documents sought by the defendant. *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir.1995).

The district court correctly ruled that the government did not have to turn over the alleged CDC debriefing of E. Castro. First, CDC is a state agency and the government in this case did not have access to

its files. *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir.1991) (holding that federal prosecutors were not in possession of CDC materials). Second, assuming that the government did have access to the debriefing, the knowledge requirement is not satisfied. A government representative testified that the government did not know whether the debriefing took place, and Appellants do not cite any evidence to indicate otherwise.

## VI Jury Instructions

Appellants argue that the district court erred in several of its jury instructions. We address each disputed instruction.

### A. RICO's Interstate Commerce Jurisdictional Element

■■■ 18 U.S.C. § 1962(c) (RICO) contains the following jurisdiction element: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce...." Appellants argue that the district court erroneously instructed the jury that this element could be satisfied if the "the activities of the enterprise affect interstate commerce in some minimal way." According to Appellants, the correct standard requires the jury to find that the enterprise had a "substantial" effect on interstate commerce. Appellants also argue that the district court's supplemental jury instruction defining a de minimis effect did not accurately capture that standard. We disagree.

■■■ Whether a jury instruction misstates elements of a statutory crime is a question of law, which we review de novo. *United States v. Patterson*, 292 F.3d 615, 629–30 (9th Cir.2002). We review de novo claims of insufficient evidence. *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir.2002). There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 641–42.

In *United States v. Juvenile Male*, we held that "all that is required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate racketeering acts have a de minimis impact on interstate commerce." 118 F.3d 1344, 1347–49 (9th Cir.1997). The district court, therefore, correctly instructed the jury that a de minimis affect on interstate commerce was sufficient to establish jurisdiction under RICO.[6]

■■■ Appellants allege also that (1) the district court erred by giving the fol-

---

**6.** Appellants argue that *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) and its progeny require a substantial effect on interstate commerce to establish jurisdiction under RICO. *Lopez* held that Congress exceeded its authority under the Commerce Clause by enacting the Gun Free School Zones Act because possession of a gun near a school was not an economic activity that substantially effected interstate commerce, nor did the statute contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affect[ed] interstate commerce." 529 U.S. at 602, 120 S.Ct. 1740; *see also United States v. Morrison*, 529 U.S. 598, 613,

120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (following *Lopez's* framework to invalidate a portion of the Violence Against Women Act, noting that "[l]ike the Gun Free School Zones Act at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"). Appellants' argument that *Lopez* governs this case is without merit. Unlike *Lopez*, RICO has a jurisdictional element and the heart of Appellants crimes, drug trafficking and extortion, are quintes-sential illegal economic activities. In addition, *Juvenile Male* explicitly rejected Appellants' argument that *Lopez* applies. 118 F.3d at 1347–49.

lowing supplemental instruction: the jurisdiction requirement is met if "the enterprise or its activities engaged in or involved interstate or international drug trafficking, use of interstate communication devices, or possession or use of weapons which traveled in interstate commerce," and (2) insufficient evidence supported the jury's finding that the jurisdictional requirement was met. The district court did not err because this instruction adequately reflected the jurisdiction requirement. Moreover, sufficient evidence supported the jury's finding that the crimes charged had at least a de minimis affect on interstate commerce, including evidence offered by the government that: (1) Appellants engaged in extensive drug trafficking; (2) firearms manufactured outside California were found at J. Hernandez's residence; (3) several Appellants sold narcotics grown outside California; (4) Barela and Mendez had discussions with Mexican drug traffickers regarding their possible involvement in an impending narcotics transaction; (5) R. Castro was involved in a telephone call from Oregon to California that discussed illegal activities; and (6) Moreno made a comment regarding a future letter he might receive from out of state.

### B. Other RICO Elements

18 U.S.C. § 1962(c), provides in relevant part: "It shall be unlawful for any person ... associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Appellants contend that the district court's jury instructions improperly defined the elements of (1) "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs"; and (2) "pattern of racketeering activity."

■ Whether a jury instruction misstates elements of a statutory crime is a question of law that we review de novo. *Patterson*, 292 F.3d at 629–30. We review for an abuse of discretion the district court's formulation of jury instructions. *United States v. Stapleton*, 293 F.3d 1111, 1114 (9th Cir.2002).

### 1. "[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs"

■ The district court gave the following instruction with respect to the "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" element:

The phrase "to conduct or participate in the affairs of the enterprise" relates to the performance of the acts, functions, or duties which *are necessary or helpful in the operation of the enterprise.*

A defendant conducts or participates in the affairs of the enterprise when that defendant participates, in some degree, in the operation, direction or management of the enterprise through a pattern of racketeering activity.

In *Reves v. Ernst & Young*, the Supreme Court held " 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must participate in the operation or management of the enterprise itself." 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (citation omitted). The Court concluded that the word "conduct" indicated some degree of direction over the affairs of the enterprise. *Id.* at 178, 113 S.Ct. 1163. The Court concluded also that the term "participate" meant "to take part in," and not to "aid and abet." *Id.* at 178–79, 113 S.Ct. 1163. Appellants contend that to capture *Reves's* operation and management test, the district court should have replaced the under-

lined language with "have some part in the operation or management of the enterprise."[7]

 The district court improperly defined "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" because the instruction did not clarify that Appellants had to be involved in the operation or management of the Mexican Mafia. We conclude, however, that the error was harmless. The district court's failure to instruct the jury on an element of a crime is harmless if we conclude that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Gracidas–Ulibarry*, 231 F.3d 1188, 1197 (9th Cir.2000) (en banc) (internal quotation omitted). Here, the evidence overwhelmingly demonstrated that each Appellant met *Reves's* operation and management test. For example, the evidence showed that during meetings Appellants voted on membership and authorization to assault or kill opponents, divided territory for the purpose of taxing drug dealers and street gangs, planned several crimes including murders, coordinated their drug trafficking activities, resolved disputes among members, and made other important decisions concerning the Mexican Mafia's affairs. The Appellants, except J. Hernandez, were not only involved in the operation and management of the Mexican Mafia, they were the members/leaders of the enterprise. J. Hernandez, on the other hand, clearly participated in the operation and management of the Mexican Mafia because he served as a messenger between incarcerated members and members on the street, and helped organize criminal activities on behalf of the organization.

**2. "Pattern of Racketeering Activity"**

 The district court gave the following instruction with respect to the "pattern" element:

A person engages in a pattern of racketeering activity if he commits at least two related acts of racketeering within ten years. The two racketeering acts may not be isolated or disconnected, but must be related to each other by a common scheme, plan, or motive. The two racketeering acts must also amount to, or pose a threat of, continued criminal activity.

In determining whether the racketeering acts constitute a "pattern," you may consider, among other things, whether the acts were closely related in time and whether they shared a similarity of purpose or method.

Appellants contend that this instruction is deficient because it failed to define "isolated."

 We conclude that the district court did not abuse its discretion by declining to define "isolated." In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir.2000). Accordingly, the district court need not define common terms that are readily understandable to the jury. *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir.2000) (holding that "false" and "statement" were common terms that the district court need not define). Here, Appellants have not cited any case law for the proposition that the district court had to define "isolated," nor is there any. The term "isolated" is simply a

---

**7.** Although *Reves* was a civil-RICO case, it applies to criminal RICO. *United States v.*

*Parise*, 159 F.3d 790, 796 n. 5 (3rd Cir.1998).

common term that is readily understandable to the jury.

### C. Pinkerton Instruction

■ In the course of instructing on RICO conspiracy, the district court gave a Pinkerton instruction (which allows the jury to find a coconspirator guilty of a reasonably foreseeable substantive offense committed by any of his coconspirators in furtherance of the conspiracy). *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Appellants contend that the instruction permitted the jury impermissibly to find an Appellant guilty of the substantive RICO charge without finding that he personally committed two acts of racketeering.

The district court did not err by giving the Pinkerton instruction. The district court repeatedly instructed the jury that it could only convict Appellants of the substantive RICO charge if the jury found that Appellants committed two racketeering acts. Furthermore, the district court instructed that the substantive RICO charge differed from the conspiracy RICO charge because the substantive charge required a finding that each Appellant was guilty of at least two of the charged racketeering acts. In light of these instructions, we cannot read the Pinkerton instruction as permitting the jury to find Appellants guilty of RICO conspiracy on less than the required elements.

### D. Accomplice Corroboration Requirement

■ Gallardo and Therrien argue that the district court erred by failing to instruct the jury, in accordance with California law, that it could not find a defendant guilty based on the testimony of an accomplice unless other evidence corroborates the testimony. We review de novo the district court's decision to preclude a defendant's proffered defense. *United States v. Ramirez–Valencia,* 202 F.3d

1106, 1108 (2000). We conclude that the district court properly instructed the jury using the federal rule, which provides that uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless the testimony is incredible or insubstantial on its face, *United States v. Necoechea,* 986 F.2d 1273, 1282 (9th Cir.1993). *United States v. Erwin,* 793 F.2d 656, 669 (5th Cir.1986) (holding that state accomplice-corroboration rule does not apply with respect to predicate acts for RICO prosecutions because the accomplice-corroboration rule is procedural, rather than an element of the offense); *United States v. Paone,* 782 F.2d 386, 393 (2nd Cir.1986) (same).

### E. Duress Instruction

■ Arias argues that the district court erred by refusing to give a duress instruction. We review de novo a district court's decision to preclude the defense of duress. *United States v. Moreno,* 102 F.3d 994, 997 (9th Cir.1996). A defendant must establish three elements to present a duress defense: "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) lack of a reasonable opportunity to escape the threatened harm." *Moreno,* 102 F.3d at 997. Fear is not enough to establish a prima facie case of duress. *Id.*

Here, the district court properly refused to instruct the jury on duress. First, Arias failed to demonstrate an immediate threat. For example, Arias claims that he attended Mexican Mafia meetings because specific members told him that he had thirty days to straighten out and regularly attend the meetings, or else they would physically assault him. Because the threat was for the possibility of action after thirty days, it did not meet the requirement of "immediacy." *United States v. Becerra,* 992 F.2d 960, 964 (9th Cir.1993) (holding

that immediacy did not exist where a mobster threatened to "take care of" defendant's family if deal did not go through); *see also United States v. Atencio*, 586 F.2d 744, 746 (9th Cir.1978) ("element of immediacy requires some evidence that such injury was present, immediate or impending"). Arias simply has not presented any facts on which we could conclude that he took certain actions because the Mexican Mafia figuratively held a gun to his head.

 Second, Arias failed to demonstrate a lack of reasonable opportunity to escape the threat. Arias baldly asserts that he could not flee the reach of the Mexican Mafia, and law enforcement could not protect him. Mere assertions are not sufficient to establish a prima facie case of duress. *Moreno*, 102 F.3d at 997.

### F. Conspiracy to Extort Instruction

 We review de novo whether a district court's jury instructions constructively amend the indictment. *United States v. Pisello*, 877 F.2d 762, 764 (9th Cir.1989).

Racketeering Act 22, alleged in the substantive RICO count, charged that R. Hernandez and others "conspired to obtain money and firearms from members of various street gangs...." The district court gave the following instruction on this crime:

> Racketeering Act 22 charges [R. Hernandez] with conspiring to *extort money and firearms* from others. In order for a particular defendant to be found guilty of conspiring to *extort money or property* from another as charged in Racketeering Act 22, the government must prove each of the following elements beyond a reasonable doubt:
>
> 1. On or about the date charged, there was an agreement between two or more persons to *extort money or other property* from another as charged in the indictment.

. . .

(Emphasis added). R. Hernandez argues that the instruction's use of "money or other property" when the indictment uses "money or firearms" amounts to a constructive amendment to the indictment.

 A constructive amendment requires reversal, and has been found where "(1) there is a complex of facts[presented a trial] distinctly different from those set forth in the charging instrument, or (2) the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Adamson*, 291 F.3d at 615. Here, the district court's instruction did not constructively amend the indictment by replacing "firearms" with "property" because all the evidence at trial proved the crime alleged in the indictment.

## VII Sufficiency Arguments

 We review de novo claims of insufficient evidence. *Carranza*, 289 F.3d at 641. There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find facts fulfilling the essential elements of the crime beyond a reasonable doubt. *Id.* at 641–42. We also review de novo sufficiency of the indictment claims. *United States v. Pernillo–Fuentes*, 252 F.3d 1030, 1032 (9th Cir.2001).

Appellants argue that there was insufficient evidence (1) that Appellants participated in a RICO enterprise, and (2) that Appellants aided and abetted the distribution of narcotics. Gallardo argues that there was insufficient evidence (1) that he murdered Ricardo Gonzales, and (2) that he conspired and attempted to murder Eduardo Soriano. Mendez argues that there was insufficient evidence (1) that he conspired to violate RICO, (2) that he aid-

ed and abetted the distribution of narcotics, (3) that he conspired to murder Donald Ortiz, and (4) that the RICO pattern element was satisfied because the racketeering acts proven against Mendez were unrelated. Mendez also argues that the indictment insufficiently alleged that he conspired to distribute narcotics. Aguirre argues that insufficient evidence supported the jury's conclusion that his interest in a 1992 Honda Accord was forfeitable because he obtained the car as a result of the narcotics distribution conspiracy.

In light of the powerful corroborated evidence viewed most favorably to the government, these sufficiency claims are patently meritless and border on frivolous. Accordingly, we need not address these claims in detail. We hold that sufficient evidence exists to support the convictions of each Appellant and Aguirre's forfeiture. We also hold that the indictment sufficiently alleged that Mendez conspired to distribute narcotics.

## VIII Sentencing Issues

 Appellants raise numerous issues regarding their sentencing. We review de novo the district court's interpretation of the Sentencing Guidelines, and review for an abuse of discretion the district court's application of the guidelines to the specific facts of a case. *United States v. Alexander*, 287 F.3d 811, 818 (9th Cir. 2002). We review for clear error the district court's factual findings in the sentencing phase. *United States v. Williams*, 291 F.3d 1180, 1196 (9th Cir.2002). A preponderance of the evidence must support these factual findings. *United States v. Montano*, 250 F.3d 709, 713 (9th Cir.2001).

### A. Sentences Based on Murder Predicate Acts

The district court imposed life sentences on the following Appellants for first-degree murder: (1) Aguirre; (2) Gallardo; (3) Shryock; and (4) Therrien.

### 1. Life Sentence Under U.S.S.G. § 2A1.1

 Gallardo and Therrien argue that the district court erred by applying U.S.S.G. § 2A1.1 ("2A1.1") for first-degree murder, rather than U.S.S.G. § 2A1.2 ("2A1.2") for second-degree murder, because the jury did not return any findings that the murder predicate acts were in the first degree. We disagree. First, the district court has authority to find by a preponderance of the evidence that 2A1.1 rather than 2A1.2 applies. *See United States v. Carter*, 300 F.3d 415, 426–27 (4th Cir.2002) (per curiam) (holding that the district court can sentence a defendant convicted for distributing narcotics under 2A1.1 for a drug-related murder even if the jury did not find the defendant guilty of such murder, provided that the district court found the murder to have occurred by a preponderance of the evidence). Second, *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) does not prevent the district court from applying 2A1.1 on these facts. In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The jury convicted Appellants of murder under California state law, which provided a maximum term of life imprisonment whether the murder was in the first or second degree. Accordingly, the district court's decision to apply 2A1.1 rather than 2A1.2 did not change the statutory maximum sentence.

### 2. District Court's Determination that Shryock Committed First Degree Murder

 Shryock argues that the district court mistakenly applied 2A1.1 based on

its clearly erroneous finding that the murder of Albert Orosco was in the first degree. We disagree because sufficient evidence in the record supported the district court's conclusion of premeditation where the evidence at trial showed that Shryock directed the killing of Orosco.

## B. Sentences Based on Drug Trafficking

■ In sentencing Arias, Barela, R. Castro, J. Hernandez, R. Hernandez, and Mendez, the district court relied on their convictions for aiding and abetting the distribution of narcotics. The district court applied U.S.S.G. § 2D1.1 to the offenses, finding by a preponderance of the evidence that the amount of drugs involved was sufficient to meet the requirements for offense level 38, the highest level. The jury did not make findings as to the amount of drugs involved. Instead, the district court made the drug quantity determinations that increased Appellants' statutory maximum sentences under 18 U.S.C. § 841(b).

■ Arias, Barela, R. Castro, J. Hernandez, R. Hernandez, and Mendez make several arguments that the district court erred in sentencing them based on its drug quantity finding, including that (1) their sentences violate *Apprendi*, (2) the district court used the wrong standard in determining drug quantity, (3) the amount of drugs sold was not "foreseeable," and (4) the district court did not individualize its determination as to responsibility. We need not address these issues because, assuming any error, Arias, Barela, R. Castro, J. Hernandez, and Mendez's sentences were justified by the doctrine of "stacking." U.S.S.G. § 5G1.2(d); *Buckland,* 289 F.3d at 570–71. Stacking applies when a defendant is convicted of multiple counts, one of which is a drug count. In such a case, the district court may determine the quantity of drugs by a pre-ponderance of

the evidence and sentence the defendant based on that quantity determination. The sentence imposed may go as high as the sum of the maximum sentence for each count of conviction as if those sentences were imposed consecutively. *Buckland,* 289 F.3d at 570–71. Such a sentence does not violate *Apprendi.*

Here, stacking allowed the district court to impose sentences up to life imprisonment on Arias, Barela, R. Castro, J. Hernandez, and Mendez. The jury convicted these Appellants of—among other counts—a substantive RICO violation under 18 U.S.C. § 1962(c) based on predicate acts that included murder. The maximum sentence for a RICO conviction is twenty years, or life if the underlying violation has a maximum sentence of life. 18 U.S.C. § 1963(a). Murder is punishable by up to life imprisonment (regardless of whether it is first-or second-degree murder). 18 U.S.C. § 1111(b). Because the jury convicted these Appellants of RICO violations based on predicate acts of murder, and the district court did not sentence them to more than life imprisonment, we affirm their sentences.

■ As the government concedes, however, the district court erred by sentencing R. Hernandez to life imprisonment. The jury convicted R. Hernandez of (1) a substantive RICO violation, based on predicate acts of conspiracy to distribute narcotics, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to extort, in violation of Cal.Penal Code §§ 182, 518; (2) a conspiracy RICO violation for the same predicate acts in the substantive RICO violation; and (3) conspiracy to distribute narcotics in violation of 21 U.S.C. § 846. The statutory maximum sentence supported by the jury verdicts against R. Hernandez was twenty years for each count. 18 U.S.C. § 1963(a); 21 U.S.C. § 841(b)(1)(C). Under the stacking rule, the district court

may only sentence R. Hernandez to a maximum of sixty years. Accordingly, we vacate R. Hernandez's sentence and remand for re-sentencing.

## IX Forfeiture

 On June 20, 1997, the jury found by a preponderance of the evidence that Aguirre's interest in a 1992 Honda Accord was forfeitable under 21 U.S.C. § 853 because he obtained it as a result of the conspiracy to aid and abet the distribution of narcotics. Aguirre argues that we should reconsider our cases holding that the standard of proof in criminal forfeiture cases is the preponderance of the evidence. *United States v. Hernandez–Escarsega,* 886 F.2d 1560, 1576–77 (9th Cir.1989). Aguirre asserts that in light of the Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the appropriate standard is beyond a reasonable doubt.

Forfeiture of all property connected with the charged offenses in this case is prescribed in the statutes proscribing the offenses themselves. *See Hernandez–Escarsega,* 886 F.2d at 1577 (noting that criminal forfeiture is an additional penalty for an offense). *Apprendi* only holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. We therefore join all other circuit courts of appeals that have considered the question, and conclude that *Apprendi* does not disturb the rule that statutorily-prescribed forfeiture is constitutional when supported by the preponderance of the evidence. *United States v. Najjar,* 300 F.3d 466, 485–86 (4th Cir.2002); *United States v. Gasanova,* 332 F.3d 297, 301 (5th Cir.2003); *United States v. Corrado,* 227 F.3d 543, 550–51 (6th Cir. 2000); *United States v. Vera,* 278 F.3d 672,

672 (7th Cir.2002); *United States v. Cabeza,* 258 F.3d 1256, 1257 (11th Cir.2001).

## CONCLUSION

For the foregoing reasons, we AFFIRM Appellants' convictions and sentences, except that we VACATE R. Hernandez's sentence and REMAND for re-sentencing consistent with this opinion.